(33 South. 351.)

No. 14,419.

BRADLEY–RAMSAY LUMBER CO., Limited. v. PERKINS, Tax Collector, et al. (GUARDIAN TRUST CO., Intervener).

(Jan. 5, 1903.)

APPEAL—REVIEW—MUNICIPAL ORDINANCES— —RAILROAD AID—SPECIAL TAX—CONDITIONS SUBSEQUENT.

1. A judgment will not be reviewed in this court at the instance of a litigant who has neither appealed, nor asked for an amendment.

2. Municipal ordinances otherwise valid may, like the acts of the legislature, be adopted to take effect in the future, and upon the happening of a contingent event.

3. Where a special tax has been voted by a few wards in a parish in aid of the construction of a standard-gauge railway, which is to traverse the state and connect with roads beyond its limits, the fact that the aided company buys a narrow-gauge logging road, already in existence, covering an insignificant proportion of the whole distance, and converts it, pro tanto, into the standard-gauge road to be built, will not defeat the right of such company to the tax.

4. An agreement between taxpayers and a railroad company which has obtained aid, by means of a special tax, for the construction of a road to extend across the state, to the effect that the company is to construct and maintain at a particular place "its repair shop and roundhouse," cannot reasonably be construed to mean that it should construct and maintain but one repair shop and one roundhouse on its line, and in such case the character of the shop and roundhouse called for by the contract is to be determined by the requirements of the road.

(Syllabus by the Court.)

Appeal from judicial district court, parish of Calcasieu; Conrad De Baillon, Judge ad hoc.

Action by the Bradley-Ramsay Lumber Company, Limited, against John A. Perkins, tax collector, and others. The receiver of the Guardian Trust Company intervened. Judgment for defendants, and plaintiff appeals. Affirmed.

Leon Sugar and R. P. Williams (T. T. Taylor, of counsel), for appellant. Pujo & Moss and Alexander & Wilkinson, for intervener appellee.

### Statement of the Case

MONROE, J. Plaintiff seeks to enjoin the tax collector from selling, for a special tax levied in aid of the Kansas City, Shreveport & Gulf Railway Company, certain lands owned by it in the parish of Calcasieu, and to annul the existing ordinance, and enjoin the police jury from adopting any other ordinance, levying such a tax. The grounds relied on may be stated, in connection with the undisputed facts, as follows:

Upon the 17th of January, 1896, the police jury of the parish of Calcasieu, upon the petition of the requisite number of property taxpayers, ordered elections to be held in Wards 3, 4, and 8 of that parish upon the question of levying a special tax, in aid of the Kansas City, Shreveport & Gulf Railway Company, subject to the following, among other, conditions, to wit:

That the company should "build, equip, operate, and maintain a line of railway, of standard gauge, from the city of Lake Charles to the north boundary of the state of Louisiana, in Caddo parish, there to connect with the Texarkana & Fort Smith Railway; thence to connect; by the Kansas City, Pittsburg and Gulf Railroad, with Kansas City, Missouri; the construction of said railway to be begun at any point on the line and at Lake Charles within six months after the official promulgation [of the result of the election] and final publication thereof, in the event the same has been favorable to the levy of said tax; and to complete said line and have the same in operation by or before December 31, 1898"; that the company should "construct, within the corporate limits of the city of Lake Charles, a freight depot, of brick or stone, and also a passenger depot, of similar material, unless converging roads in the city of Lake Charles build ·a union depot of similar material; Lake Charles

to be the end of the division, so long as the road is not further extended"; and that the company should "construct and maintain within the corporate limits of the city of Lake Charles its repair shop and roundhouse, all of which depots, repair shop, and roundhouse shall be built and completed on or before December 31st, 1898."

The elections were held as ordered, and resulted favorably to the tax, and the results were promulgated and the tax levied by an ordinance adopted March 16, 1896, which reads, in part, as follows:

"* * * Special tax of three and one-half mills on the dollar for a period of ten years, be, and the same is, hereby, levied * * * in aid of the Kansas. City, Shreveport & Gulf Railway Company, its successors and assigns, said tax to be paid over and collected from year to year * * * subject to the stipulations and upon full compliance with the conditions and provisions of the contract made between the citizens' committee and said railway company, as set forth and embodied in the ordinance submitting the question of the levy of such special tax.

"Sec. 2. * * * That said special tax * * * shall be collected from each of said wards, severally, commencing with the year 1897, provided that said railway shall have been constructed and operated in accordance with said contract * * * and provided further, that all other stipulations in said contract and obligations assumed by said company as therein specified shall have been first complied with, the same as if specially exacted in this ordinance. * * *"

No action was taken under the ordinance so adopted during the years 1897 and 1898, but the tax was levied agreeably to its provisions in and for the year 1899, and when, in 1900, the plaintiff's property was seized and offered for sale in satisfaction thereof, the plaintiff brought this action, alleging, in substance:

(1) That the ordinance is illegal because by its terms it could not become operative "except upon the happening of remote contingencies and future and uncertain events," and because it provided for the collection of the tax for the year 1897 at a time when it was not known, and could not have been known, whether the conditions upon which such tax was to become exigible would ever be fulfilled.

(2) That the railway company did not build its road from Lake Charles to the northern boundary of Louisiana, but built it from Port Arthur, Tex., to such northern boundary on a line 20 miles away from Lake Charles, and then bought a narrow-gauge road already in existence, and, by extending it at either end and broadening the gauge, connected Lake Charles with the main line.

(3) That Lake Charles was never made the end of any division of the road, and no through freight or passenger trains, sleeping or mail cars, run into that city.

(4) That no repair shop has been built or maintained in Lake Charles.

It appears that the tax in question had been assigned by the railway company to a corporation now known as the Guardian Trust Company, for which a receiver had been appointed by the United States circuit court in Missouri, and that the appointment so made had been followed by an ancillary appointment of the same person to the same position by the United States circuit court for the Northern district of Louisiana; and this receiver intervened—First, to ask that the case be removed to the court last mentioned; and, that request having been denied, to defend as the real party concerned. The tax collector, for answer to both the main demand and the intervention, disclaims all interest in the matter, and the police jury pleads a general denial.

The record shows that the Kansas City, Shreveport & Gulf Railway Company was incorporated under the laws of Louisiana, mainly, as declared by its charter, for the purpose of building and operating "a railway from a point on the Arkansas state line, on the north boundary of Caddo parish, La., by way of Shreveport, or its vicinity, in a southerly direction, to a point at, or near, Sabine Pass, in Louisiana, or Texas, with a branch from said main line to New Orleans."

The domicile of the corporation was established at Shreveport, which city lies about 200 miles north, by perhaps 10 miles east, of Sabine Pass, and about 160 miles north, by perhaps 45 miles west, of the city of Lake Charles. The main line thus referred to curves somewhat to the eastward until at De

Quincy it reaches a point about 20 miles to the northwestward of Lake Charles, and is there connected with that thriving city by a branch or spur, the track of which, like that of the main line, is of standard gauge; i. e., 56½ inches. For the establishment of this branch the railway company bought a narrow-gauge or 40-inch road, having one terminus at Westlake, a point to the westward and across the Calcasieu river and its west fork from Lake Charles, and its other terminus at or near Edgewood, a few miles southeast from De Quincy. This road had been built and was mainly used by its owners, who were millmen (incorporated), for logging purposes, and there is nothing in the record to indicate that they intended to extend it or to change the gauge. The purchasers made use of about 11 miles of it, beginning at a point four or five miles westward or northwestward from the city of Lake Charles, and, in order to do so, converted it into a standard-gauge road, substituted 60 for 35 pound rails, constructed and reconstructed bridges, etc. This work was done by the 16th of December, 1898, and a standard-gauge road was completed between Lake Charles and the Arkansas line, as had been agreed on; and by that date the railway company had constructed in Lake Charles freight and passenger depots of brick, a roundhouse, and a repair shop; and, as we understand the testimony, that part of the road extending from De Quincy, south or southwest, to Sabine Pass, was completed somewhat later. The repair shop is not equipped for the building of cars or for the making of extensive repairs. The company has a larger shop at Shreveport, where work of that kind may be done, and at intervals of about 90 miles has smaller shops, including that at Lake Charles, at which light repairs, sufficient to enable a disabled car to get back to the main shop, may be made. There was judgment in the district court rejecting its demands, and plaintiff alone has appealed.

### Opinion.

As the intervener has neither appealed nor prayed for an amendment of the judgment, the ruling of the district court in declining to remove the cause to the United States court is not before us for review.

"Municipal ordinances otherwise valid may, like an act of the legislature, be adopted to

109 LA.—11

take effect in the future, and upon the happening of a contingent event." Dill. Mun. Corp. (4th Ed.) § 309. And they may be good in part and bad in part. Id. 421.

Section 4 of Act No. 35 of 1886, as amended by Act No. 153 of 1894, provides that if an election such as was held in this case goes in favor of the special tax, the police jury "shall immediately pass an ordinance levying such tax for such time as may have been specified in the petition, and shall designate the year in which such taxes shall be levied and collected."

Upon the other hand, section 7 of the act (No. 35) of 1886, which has not been amended or repealed, reads:

"That the right to receive * * * such taxes may be assigned * * * to any person * * * or corporation; and such person * * * or corporation shall have the same right to enforce the collection * * *; provided, that, no such tax shall be paid by such parish, city, or incorporated town until the railway has been completed and in operation to such point in such parish * * * as may be specified in the proposition set forth in the petition required in the first section of this act."

Construing these provisions of the law together, it would seem that, if the taxpayer chooses to vote a special tax in aid of a railway, it may be levied and collected at once, subject to the condition that the police jury, or other authority by whom it is collected, is prohibited from paying it over to the beneficiary until the railway in aid of which it is voted is completed and put in operation. In the instant case, however, whatever may have been the rights of the railway company in the premises,—and we express no opinion upon that subject,—the police jury made the levy of the tax subject to the condition, not that the work should be done, but that it should have been done. Thus the ordinance reads:

"* * * That said special tax * * * shall be collected * * * commencing with the year 1897, provided, that said railway shall have been constructed and operated * * * and * * * that all other stipulations in said contract and obligations assumed by said company as therein specified, shall have been first complied with, the same as if specially exacted in this ordinance."

As the obligations assumed by the company had not been complied with in 1897, and it is not asserted that they were complied with before the 16th of December, 1898, the ordinance, by its terms, levied no tax for those years. If, however, it be true that in December, 1898, the company had complied with the conditions upon which its right to the tax was made to depend, then, whatever may be the situation as to the years that had passed, the ordinance became operative as to the tax for the year 1899 and subsequent years.

The question, then, is, had the company in December, 1898, earned the tax?

If the little, narrow-gauge logging road referred to in the statement of the case had been, or had been likely to become, an independent or competing line, connecting Lake Charles with the same territory as that to become connected with which the tax was voted, there would be much force in the plaintiff's position. But such was not the case. The road did not enter the city of Lake Charles at all, could have done so only at a heavy expense for bridge building and terminal facilities, and, as a narrow-gauge road, would even then have served no useful purpose in the way of establishing traffic connections with the outside world. The taxpayers have therefore no reason to complain that the railway company converted it into a standard-gauge road, brought it into their city, and extended it in the other direction so as to connect it with, and make it part of, the standard-gauge line running to and beyond the Arkansas border.

If they supposed that the main line of the road which they were aiding was to run to or through Lake Charles, they have only themselves to blame. The charter of the company was open to their inspection, and it declares that the main line is to extend from Arkansas, through or near Shreveport, to Sabine Pass, either in Texas or Louisiana, and there is nothing to the contrary in the agreement between the company and the taxpayers, and nothing whatever as to the manner in which the company shall operate its trains or its cars. Let us suppose that, instead of completing the road from De Quincy to Port Arthur, the company had contented itself for a while with running its cars from the Arkansas line to Lake Charles. It would then have complied with its contract with the taxpayers as to that particular feature. But it would not have been obliged, either by the letter or the spirit of that contract, to have extended its road westward from Lake Charles, or in any other direction; nor, upon the other hand, would it have been deprived of the right to extend it, either from Lake Charles or from any other point, to Sabine Pass, and, having done so, to operate its trains as its business and the interests of the public might require.

In the matter of the repair shop, whilst the company can hardly be said to have given them the benefit of a very liberal interpretation, it must be remembered that the terms in which its obligation in that respect were imposed were prescribed by the taxpayers themselves. The contract reads: "Said railway company also agrees to construct and maintain, within the corporate limits of the city of Lake Charles, its repair shop and roundhouse," etc. The roundhouse constructed and maintained by the company has but four stalls, and, for aught that appears, there may be many others on the line capable of accommodating more engines than that at Lake Charles. There is, however, no complaint on that account. And yet, if the argument which is addressed to the court with regard to the repair shop be applied, it would follow that by the terms of the contract the company is prohibited from maintaining any roundhouse on its road between Lake Charles and the Arkansas line. As we gather from the testimony, however, railway companies require roundhouses and repair shops, some of larger and some of smaller capacity, at different places on their roads; and, in the absence of anything more specific, the expression "its repair shop and roundhouse" must be taken to mean nothing more than such repair shop and roundhouse as may be required upon the particular section or division of the road to which it refers. In the instant case it appears that the company has at Lake Charles a shop in which there are a few tools, and that it has there in its employ, a few (possibly three) men, who with those tools are able to make such light repairs as may be necessary to enable a damaged car or engine to get to the better-equipped shop at Shreveport. It also appears that it has a shop of the same kind at a point about halfway between Lake

Charles and Shreveport, and that these are sufficient for its purposes. As we are not prepared to say that the company is denied the right to maintain more than one repair shop, or that the shop to be maintained at Lake Charles must be of any prescribed dimensions or capacity, we must hold that there has been in this respect a sufficient compliance with its contract. City of Alexandria v. Morgan's Louisiana & T. R. & S. S. Co., ante, p. 50, 33 South. 65.

For these reasons, the judgment appealed from is affirmed at the costs of the appellant.